## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THE CINCINNATI INSURANCE COMPANY,**<br>6200 S. Gilmore Road<br>Fairfield, OH 45014-5141<br><br>**Plaintiff,**<br>**v.**<br><br><br>**CAN MAN, LLC d/b/a BEST BEV CO.,**<br>2512 Quakertown Road<br>Pennsburg, PA 18073<br><br>and<br><br>**BEST BEV, LLC**<br>80 William Donnelly Parkway<br>Waverly, NY 14892<br><br>**Defendants.** | )<br>)<br>)<br>)<br>) **CIVIL ACTION**<br>)<br>) **No. _____**<br>)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>DECLARATORY JUDGMENT COMPLAINT</u>

Plaintiff, The Cincinnati Insurance Company ("Cincinnati"), by and through its undersigned counsel, Post & Schell, P.C., hereby files this Declaratory Judgment Complaint against Defendants, Can Man, LLC and Best Bev, LLC, (collectively, the "Defendants") seeking declaratory and other relief, and avers as follows:

## I.     <u>INTRODUCTION</u>

1.      Cincinnati files this Declaratory Judgment Complaint against Can Man, LLC ("Can Man") and Best Bev, LLC ("Best Bev") seeking a declaration that it (Cincinnati) has no duty to defend or indemnify the Defendants named herein in connection with an underlying lawsuit captioned *Happy Hour Drinks Co., Inc. v. Can Man, LLC d/b/a Best Bev Co., et al.*, pending in the

United States District Court for the Northern District of New York pursuant to docket number 3:24-cv-00047 (the "Underlying Action").

2.     Cincinnati has issued insurance policies naming both Can Man and Best Bev as named insureds thereunder (collectively, the "Cincinnati Policies") for time periods relevant to the allegations of the Underlying Action.

3.     For purposes of this lawsuit, three separate Cincinnati Policies are potentially at issue – defined below as the 2021-22 Policy, the 2022-23 Policy and the 2023-24 Policy.

4.     In the Underlying Action, plaintiff Happy Hour Drinks Company, Inc. ("Happy Hour") alleges in its complaint filed on January 11, 2024 (the "Underlying Complaint") that:

> This action stems from reckless and negligent manufacturing procedures employed by Can Man over the course of multiple production runs that caused [Happy Hour] to incur millions of dollars in damages. The damages caused by Can Man's conduct, and by the defective product it delivered, caused [Happy Hour] to suffer damages at the hands of its distributors, its retailers, and its customers. The damages are catastrophic and debilitating to a young start-up company with considerable momentum.

5.     Cincinnati has agreed to provide a defense to Defendants via a reservation of rights letter dated May 31, 2024 (the "First ROR"), subject to a complete reservation of all of Cincinnati's rights.

6.     The Defendants have accepted Cincinnati's offer and provision of defense for the Underlying Action subject to a reservation of right and, at this time, Cincinnati continues to provide a defense to Defendants in the Underlying Action.

7.     However, Cincinnati believes that it has no obligation to defend or indemnify the Defendants as to the claims and damages against them in the Underlying Action.

8.    Accordingly, by letter dated November 20, 2024, Cincinnati issued a supplemental reservation of rights letter to Defendants (the "Supplemental ROR") pursuant to Cincinnati's continued investigation into the claims and allegations of the Underlying Action.

9.    In the Supplemental ROR, Cincinnati explained that based on its review of the Cincinnati Policies and the damages alleged in the Underlying Action, "it does not appear that Happy Hour seeks recovery of any damages covered by the Cincinnati Policies."

10.    Cincinnati further requested that, if Defendants disagree, they please let Cincinnati know and explain the basis for their position.

11.    Defendants have not demonstrated that Happy Hour seeks recovery of any damages covered by the Cincinnati Policies.

12.    As such, and for the reasons explained below, Cincinnati asks this Court to declare that Cincinnati has no obligation to indemnify any of the damages alleged in the Underlying Action and, thus, that Cincinnati also has no duty to continue defending Defendants in the Underlying Action.

13.    The 2021-22 Policy contains two coverage parts that were not included in the later 2022-23 Policy or the 2023-24 Policy:  The Product Recall Expense Coverage Endorsement (the "Product Recall Coverage") and the Manufacturer's Errors and Omissions Coverage Form (the "E&O Coverage").

14.    As explained below, neither the Product Recall Coverage nor the E&O Coverage applies to the Underlying Action because the claims and damages alleged in the Underlying Action do not fall within the Insuring Agreements of either of those coverage parts.  Further, several exclusions to the Product Recall Coverage and the E&O Coverage bar coverage to Can Man and Best Bev for the Underlying Action.

15.     Additionally, neither the Commercial General Liability Coverage Part (the "CGL Coverages") nor the Umbrella Liability Coverage Part (the "Umbrella Coverages") in the three Cincinnati Policies provides coverage for the Underlying Action because (1) damages sought in the Underlying Action were not caused by an "occurrence" as that term is defined by the Cincinnati Policies and Pennsylvania courts, (2) many of the damages sought by Happy Hour are for purely intangible economic losses which do not qualify as "property damage" as that term is defined by the Cincinnati Policies, and/or (3) various below-discussed exclusions (including but not limited to the Damage to Your Product exclusion, the Fungi or Bacteria exclusion, and the Recall of Products, Work or Impaired Property exclusion) preclude coverage for the claims and damages asserted in the Underlying Action.

16.     Cincinnati thus asks this Court to declare that Cincinnati has no duty to defend or indemnify the Defendants in the Underlying Action and thus that Cincinnati may withdraw its defense of the Defendants in the Underlying Action.

17.     **In the _alternative_**, Cincinnati asks this Court to identify what damages, if any, alleged in the Underlying Action are potentially covered by the Cincinnati Policies – so that Cincinnati and Defendants can have the benefit of such a determination in evaluating and addressing settlement possibilities in the Underlying Action.

18.     In citing certain policy terms, provisions, definitions, exclusions, limitations and/or conditions in this Complaint, Cincinnati does not waive any other policy terms, provisions, definitions, exclusions, limitations and/or conditions that may also apply to bar or limit coverage for the Underlying Action.

## II.    PARTIES

19.    Cincinnati is a citizen of Delaware and Ohio – being a corporation organized and existing under the laws of the state of Delaware and which has its principal place of business at 6200 S. Gilmore Road, Fairfield, Ohio 45014-5141.

20.    Upon information and belief, defendant Can Man is a citizen of Pennsylvania – being a limited liability company organized and existing under the laws of the State of Pennsylvania and having its principal place of business in Pennsburg, Pennsylvania or Landenberg, Pennsylvania.

21.    Upon information and belief, no member of Can Man is a citizen of either Delaware or Ohio.

22.    Upon information and belief, defendant Best Bev is a limited liability company existing under the laws of the U.S. Virgin Islands, and having its principal place of business in Waverly, New York.

23.    Upon information and belief, no member of Best Bev is a citizen of Delaware or Ohio.

## III.    JURISDICTION

24.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(1) because the amount in controversy in this action exceeds the sum or value of $75,000.00, exclusive of interest and costs, and the dispute in this action is between citizens of different states.

25.    The amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, because the limits of the Cincinnati Policies exceed $75,000.00 and because Happy Hour has claimed damages allegedly reaching millions of dollars in the Underlying Action.

26.    The dispute in this action is between citizens of different states.

27.    The citizenship of the parties is diverse with Plaintiff being a citizen of both Delaware and Ohio and, upon information and belief, neither Can Man nor Best Bev are citizens of either Delaware or Ohio.

28.    The "citizenship of an LLC is determined by the citizenship of each of its members." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010).

29.    Cincinnati has been unable to identify (via the internet and LEXIS public record searches) any members or owners of either Can Man or Best Bev that are also citizens of Plaintiff's states of citizenship – Delaware and Ohio.  This is sufficient specificity to support a finding of diversity jurisdiction as to the LLC entities.  *Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99 (3d Cir. 2015).

30.    Accordingly, this action satisfies diversity of citizenship jurisdiction pursuant to 28 U.S.C. §1332 because, as set forth above, all parties are of diverse citizenship and the amount in controversy exceeds $75,000.00.

31.    Moreover, the Court has jurisdiction over this action pursuant to the Declaratory Judgment Act, 28. U.S.C. §2201(a), because this action presents a case of actual controversy and seeks an order declaring the rights and other legal relations of the parties to this action.

## IV.    <u>VENUE</u>

32.    Venue is proper in the Easter District of Pennsylvania pursuant to 28 U.S.C. §1391(b)(2).

33.    Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. 1391(b)(2) because a substantial portion of the events giving rise to this action occurred in the Eastern District of Pennsylvania.

34. The contracts giving rise to this action, the Cincinnati Policies, were (a) issued to Can Man and Best Bev as the named insureds at the address of 1619 New London Road, Landenberg, Pennsylvania 19350; (b) by HMK Insurance at 54 S. Commerce Way, Suite 150, Bethlehem, Pennsylvania 18017-8619; (c) intending to cover risks associated with operations performed by Defendants; and, (d) including within the Cincinnati Policies Pennsylvania specific changes, notices and endorsement forms.

## V. THE CINCINNATI POLICIES

35. Cincinnati issued an insurance policy to first named insured, "Can Man LLC", bearing policy number EPP 063 92 12 for the policy period effective December 16, 2021, to December 16, 2022 (the "2021-22 Policy").

36. A true and correct copy of the 2021-22 Policy (with certain financial information redacted) is attached hereto as "Exhibit 1."

37. The 2021-22 Policy contains an endorsement which adds "Best Bev LLC" as a named insured to that policy effective August 29, 2022. *See* Ex. 1 at Cincinnati005.

38. The 2021-22 Policy provides certain commercial general liability coverage (the "2021-22 CGL Coverage") and commercial umbrella liability coverage (the "2021-22 Umbrella Coverage"). *See* Ex. 1 at Cincinnati058 and Cincinnati252.

39. Subject to the terms, conditions, and exclusions of the 2021-22 Policy, the 2021-22 CGL Coverage is subject to a $1,000,000 each occurrence limit, a $2,000,000 general aggregate limit, and a $2,000,000 products-completed operations aggregate limit. *See id.* at Cincinnati056.

40. Subject to the terms, conditions, and exclusions of the 2021-22 Policy, the 2021-22 Umbrella Coverage is subject to a $1,000,000 each occurrence limit, and a $1,000,000 aggregate limit. *See id.* at Cincinnati248.

41.     Further, the 2021-22 Policy also contains certain product recall expense coverage via an endorsement (form GA 226 02 12) (the "Product Recall Coverage") as well as certain manufacturer's errors and omissions coverage (form GA 121 06 12) (the "E&O Coverage"). *See id.* at Cincinnati158 and Cincinnati199.

42.     Subject to the terms, conditions, and exclusions of the 2021-22 Policy, the Product Recall Coverage is subject to a $100,000 product recall expense limit for each recall, a $200,000 product recall expense aggregate limit, a $50,000 customer approval advertising costs and cost to repair or replace for each recall limit, a $100,000 customer approval advertising costs and cost to repair or replace for each recall limit, and a $5,000 deductible for each recall. *See id.* at Cincinnati158.

43.     Subject to the terms, conditions, and exclusions of the 2021-22 Policy, the E&O Coverage is subject to a $1,000,000 per claim limit and a $1,000,000 aggregate limit. *See id.* at Cincinnati198.

44.     Cincinnati renewed the 2021-22 Policy for two subsequent policy periods effective from December 16, 2022 to December 16, 2023 (the "2022-23 Policy"), and from December 16, 2023 to December 16 2024 (the "2023-24 Policy").

45.     Both the 2022-23 Policy and the 2023-24 Policy name both Can Man and Best Bev as named insureds, pursuant to the same policy number:  EPP 063 91 12 (collectively, the "2022-23 & 2023-24 Policies").

46.     A true and correct copy of the 2022-23 Policy (with certain financial information redacted) is attached hereto as "Exhibit 2."

47.     A true and correct copy of the 2023-24 Policy (with certain financial information redacted) is attached hereto as "Exhibit 3."

A. **The 2021-22 Policy**

    i. **The 2021-22 CGL Coverage**

48. The 2021-22 CGL Coverage's Insuring Agreement of SECTION I – COVERAGES, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY provides, in pertinent part, the following:

1. **Insuring Agreement**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any occurrence and settle any claim or "suit" that may result. But:

        (1) The amount we will pay for damages is limited as described in **SECTION III – LIMITS OF INSURANCE**; and

        (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgment or settlements under **SECTION I – COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGES LIABILITY; SECTION I – COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**; or medical expenses under **SECTION I – COVERAGES, COVERAGE C. MEDICAL PAYMENTS**.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**.

    b. This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2) The "bodily injury" or "property damage" occurs during the policy period; and

- 9 -

* * *

Ex. 1 at Cincinnati058.

49.    The 2021-22 CGL Coverage defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Ex. 1 at Cincinnati076.

50.    The 2021-22 CGL Coverage defines "property damage," in relevant part, as:

> **17.**    "Property damage" means:
>
> **a.**    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> **b.**    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
>
> * * *

Id. at Cincinnati077.

51.    The 2021-22 CGL Coverage is subject to several exclusions which limit and preclude its coverage.

52.    One such exclusion to the 2021-22 CGL Coverage is the Expected or Intended Injury exclusion which provides, in pertinent part, the following:

> **a.**    **Expected or Intended Injury**
>
> "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

Id. at Cincinnati059.

53.    The 2021-22 CGL Coverage is also subject to the Contractual Liability exclusion which provides, in pertinent part, the following:

      **b.**      **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

    (1)    That the insured would have in the absence of the contract or agreement; or

* * *

*Id.*

54.     The 2021-22 CGL Coverage is also subject to the Damage to Your Product exclusion which provides that the 2021-22 CGL Coverage will not apply to "'[p]roperty damage' to 'your product' arising out of it or any part of it." *See id.* at Cincinnati062.

55.     The 2021-22 CGL Coverage defines "your product" to mean:

**25.**    "Your Product":

    **a.**    Means:

        **(1)**    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            **(a)**    You;

            **(b)**    Others trading under your name;

            **(c)**    A person or organization whose business or assets you have acquired; and

        **(2)**    Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    **b.**    Includes:

        **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

> **(2)** The providing of or failure to provide warnings or instructions.

*Id.* at Cincinnati077.

56. Additionally, the 2021-22 CGL Coverage is subject to the Damage to Your Work exclusion which provides that coverage will not be available for:

> **l. Damage to Your Work**
>
> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

*Id.* at Cincinnati063.

57. The 2021-22 Policy defines "products-completed operations hazard" and "your work" as:

> **19.** "Products-completed operations hazard":
>
> **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>
> > **(1)** Products in your physical possession; or
> >
> > **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
> >
> > > **(a)** When all of the work called for in tour contract has been completed; or
> > >
> > > **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or
> > >
> > > **(c)** When that part of the work done at a job site has been put

- 12 -

to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

\* \* \*

**26.**   "Your Work":

**a.**   Means:

**(1)**   Work or operations performed by you or on your behalf; and

**(2)**   Materials, parts or equipment furnished in connection with such work or operations.

**b.**   Includes:

**(1)**   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)**   The providing of or failure to provide warnings or instructions.

*Id.* at Cincinnati076-77.

58.   Further, the 2021-22 CGL Coverage is subject to the Damage to Impaired Property or Property Not Physically Injured exclusion which provides:

**m.**   **Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)**   A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)**   A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

*Id.* at Cincinnati063.

59. The 2021-22 CGL Coverage defines "impaired property" as:

> **11.** "Impaired Property" means tangible property other than "your product" or "your work", that cannot be used or is less useful because:
>
> > **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
> >
> > **b.** You have failed to fulfill the terms of a contract or agreement;
>
> If such property can be restored to use by:
>
> > **a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or
> >
> > **b.** Your fulfilling the terms of the contract or agreement.
>
> * * *

*Id.* at Cincinnati074.

60. The 2021-22 CGL Coverage also is subject to the Recall of Products, Work or Impaired Property exclusion (the "Recall Exclusion"), which provides that the 2021-22 CGL Coverage will not provide coverage for:

> **n.** **Recall of Products, Work or Impaired Property**
>
> Any liability or damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
>
> **(1)** "Your product";
>
> **(2)** "Your work";
>
> **(3)** "Impaired Property";
>
> if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

*Id.* at Cincinnati063.

61. The 2021-22 CGL Coverage also is subject to an endorsement entitled Fungi or Bacteria Exclusion which modifies the coverage provided by, and adds an exclusion to, the 2021-22 CGL Coverage. *See id.* at Cincinnati174.

62. The Fungi or Bacteria Exclusion provides that the 2021-22 CGL Coverage will not apply to:

* * *

**Fungi or Bacteria**

a. "Bodily injury" or "property damage" caused directly or indirectly, in whole or in part, by any actual, alleged or threatened:

(1) Inhalation of;

(2) Ingestion of;

(3) Contact with;

(4) Absorption of;

(5) Exposure to;

(6) Existence of; or

(7) Presence of,

any "fungi" or bacteria on or within a building or structure, including its contents, whether occurring suddenly or gradually;

b. Any loss, cost, or expense associated in any way with, or arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, mitigating or disposing of, or in any way responding to, investigating, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity;

c. Any liability, with respect to "fungi" or bacteria, arising out of, resulting from, caused by, contributed to, or in any way related to any supervision, instruction, recommendation, warning or advice given or which should have been given in connection with:

(1) The existence of "fungi" or bacteria;

(2) The prevention of "fungi" or bacteria;

(3) The remediation of "fungi" or bacteria;

(4) Any operation described in Paragraph A.2.b. above;

(5) "Your product"; or

(6) "Your work"; or

**d.**     Any obligation to share damages with or repair any person, organization or entity, related in any way to the liability excluded in Paragraphs A.2.a., b., or c. above;

regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to the injury or damage.

However, this exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for human ingestion.

\* \* \*

**C.**     For the purposes of this endorsement, **SECTION V – DEFINITIONS** is amended to include the following:

"Fungi" means any type or form of fungus, an includes, but is not limited to, any form or type of mold, mushroom or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

*Id.* at Cincinnati174-75.

63.     The 2021-22 CGL Coverage also is subject to the Product Recall Expense Coverage

Endorsement. *See id.* at Cincinnati158.

64.     The Product Recall Expense Coverage Endorsement modifies the 2021-22 CGL

Coverage and provides that:

\* \* \*

**I.**     The following is added to **SECTION I – COVERAGES**:

**PRODUCT RECALL EXPENSE**

1.     **Insuring Agreement**

**a.**     We will pay your "product recall expense" arising out of a "product recall" which occurs during the "coverage term" and that takes place in the "coverage territory". We will only pay for "product recall expense" arising out of "your products":

**(1)**     Which have been physically relinquished to others; and

**(2)**     Which were manufactured, sold, distributed or handled by you no earlier than the Cut off Date designed in the Schedule.

\* \* \*

- 16 -

**IV.**   For purposes of the insurance provided by this endorsement only, **SECTION V – DEFINITIONS** is amended as follows:

* * *

**C.**   The definition of "Your product" is replaced with the following:

"Your product" means:

**a.**   Goods or products manufactured, sold or handled by you or distributed by you or others trading under your name including any container (other than a vehicle), when possession of these goods or products have been relinquished to others.

**b.**   Any property incorporating your product only when physical possession of these goods or products have been relinquished to others.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**D.**   The following definitions are added:

* * *

**3.**   "Product recall" means a withdrawal or removal from the market of "your product" based on the determination by you or any regulatory or governmental agency that the use or consumption of "your product" has caused, could cause or will cause actual or alleged "bodily injury" or "property damage" to tangible property other than "your product". Such determination requires you to recover possession or control of "your product" from any distributor, purchaser or user, or to destroy "your product", but only if "your product" is unfit for use or consumption or is hazardous as a result of:

**a.**   An accidental error or omission by an insured in the design, manufacturing, processing, labeling, storage or transportation of "your product"; or

**b.**   Actual or alleged intentional, malicious or wrongful alteration or contamination of "your product" by someone other than you.

**4.**   "Product recall expense" means reasonable and necessary expense for:

**a.**   Communication, including but not limited to electronic or print media, including stationary, envelopes and postage;

**b.**   Transporting recalled products from any purchaser, distributor or user to locations designated by you;

- 17 -

**c.** Remuneration paid to your "employees" for overtime, as well as remuneration paid to additional "employees" or "temporary workers" you hire;

**d.** Computer time;

**e.** Hiring independent contractors;

**f.** The actual cost of disposal of "your products", but only to the extent that specific methods of destruction, other than those usually employed for trash discarding or disposal, are required to avoid "bodily injury" or "property damage" as a result of such disposal;

**g.** Rental expense incurred from temporary locations used to store recalled products;

**h.** Extra expenses incurred by your "employees" including transportation, meals and accommodation expenses; and

**i.** Inspection and testing of "your products" to determine whether or not they may be subject to a "product recall";

as a result of a "product recall".

\* \* \*

*Id.* at Cincinnati158-62.

65. Throughout all the Cincinnati Policies, the words "you" and "your" refer to the Named Insured shown in the Declarations of the relevant policy. *Id.* at Cincinnati058, Cincinnati199, Cincinnati252.

66. As mentioned previously, both Can Man and Best Bev are Named Insureds to the 2021-22 Policy. *Id.* at Cincinnati005.

67. The Product Recall Expense Coverage contains exclusions, including the following which provide that the Product Recall Expense Coverage does not apply to any "product recall expense" arising out of:

**c.** **Deterioration, Decomposition or Chemical Transformation**

Any "product recall" initiated due to transformation of a chemical nature, deterioration or decomposition of "your product". This

- 18 -

exclusion does not apply if such deterioration, decomposition, or transformation is caused by:

**(1)**   An accidental error or omission by an insured in the design, manufacturing, labeling, storage or transportation of "your product"; or

**(2)**   Actual or alleged intentional, malicious or wrongful alteration or contamination of "your product" by someone other than you.

* * *

**e.**   **Faulty Formula or Specifications**

Improper, inadequate or faulty formula or specifications.

* * *

**h.**   **Legal Defense**

The defense of any claim or "suit" against any insured.

* * *

**n.**   **Third Party Damages, Fines and Penalties**

Any compensatory damages claimed, owed or awarded in a civil or other proceeding, fines, penalties, punitive or exemplary or other non-compensatory damages imposed upon the insured or others acting on behalf of any insured.

*Id.* at Cincinnati159-60.

### ii.   The 2021-22 Policy's E&O Coverage

68.   The 2021-22 Policy also provides certain E&O Coverage, which provides in part that:

**SECTION I - COVERAGE**

**A.**   **Insuring Agreement**

**1.**   We will pay those sums that the insured becomes legally obligated to pay  as damages because of a "claim" to which this insurance applies.  The damages must have resulted from the insured's negligent act, error or omission, or from a defect in materials or in a product sold or installed by the insured.  We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply.  We

- 19 -

may at our discretion investigate any incident and settle any "claim" or "suit" that may result. But:

* * *

**2.** This insurance applies to all "claims" covered hereunder only if a "claim" for damages is first made against any insured, in accordance with Paragraph 3. below, during the policy period or any Extended Reporting Period we provide under Paragraph **D. Extended Reporting Periods**.

**3.** A "claim" by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:

**a.** When an insured reports to us an incident or circumstance that may lead to a "claim or loss"; or

**b.** When notice of such "claim" is received in writing by an owner, partner, member, manager, "executive officer" or designated risk manager, or similar office or position, of the Named Insured or by us, whichever comes first.

**4.** All "claims" of damages arising from the same negligent act, error, omission, or defect in material or product will be deemed to have been made at the same time the first of these "claims" is made against any insured.

* * *

*Id.* at Cincinnati199.

69.    The E&O Coverage provided by the 2021-22 Policy is subject to several exclusions, including the following exclusions relevant to this lawsuit barring E&O Coverage for:

**3.    Bodily Injury, Property Damage, or Personal and Advertising Injury**

* * *

**b.** "Property damage" to property other than "your product", "your work" or "impaired property"

* * *

**5.    Contractual**

Any liability assumed by the insured under any express warranty, guarantee, contract, or agreement, whether oral or in writing. This exclusion does not apply to liability for damages that the insured would have in the absence of the express warranty, guarantee, contract, or agreement.

* * *

- 20 -

**9.**     **Fungi or Bacteria**

    **a.**     Any liability caused directly or indirectly, in whole or in part, by any actual, alleged or threatened:

        **(1)** Inhalation of;

        **(2)** Ingestion of;

        **(3)** Contact with;

        **(4)** Absorption of;

        **(5)** Exposure to;

        **(6)** Existence of; or

        **(7)** Presence of,

    any "fungi" or bacteria;

    **b.**     Any loss, cost, or expense associated in any way with, or arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, mitigating or disposing of, or in any way responding to, investigating, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity;

    **c.**     Any liability, with respect to "fungi" or bacteria, arising out of, resulting from, caused by, contributed to, or in any way related to any supervision, instruction, recommendation, warning or advice given or which should have been given in connection with:

        **(1)**     The existence of "fungi" or bacteria;

        **(2)**     The prevention of "fungi" or bacteria;

        **(3)**     The remediation of "fungi" or bacteria;

        **(4)**     Any operation described in Paragraph A.2.b. above;

        **(5)**     "Your product"; or

        **(6)**     "Your work"; or

    **d.**     Any obligation to share damages with or repair any person, organization or entity, related in any way to the liability excluded in Paragraphs A.2.a., b., or c. above;

regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to the injury or damage.

However, this exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for human ingestion.

\* \* \*

**13.    Noncompensatory Damages**

All "claims":

>    **a.**    Alleging, arising out of, based upon, or attributable to any proceeding whether civil, criminal, or administrative in which the relief sought is other than monetary damages, including but not limited to proceedings seeking injunctive relief, declaratory relief, disgorgement, or other equitable remedies, or those arising out of any kind of criminal proceedings; or

>    **b.**    Civil or criminal fines or penalties imposed by law, punitive or exemplary damage or any other type of non-compensatory damages, the multiplied portion of multiplied damages, taxes, any amount for which an insured is not financially liable, or matters which are deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

\* \* \*

**21.    Recall of Products, Work or Impaired Property**

Any liability for damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

>    **a.**    "Your product";

>    **b.**    "Your work"; or

>    **c.**    "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

\* \* \*

**25.    Substitutions**

Any liability arising from a decision to substitute a material or a product for one specified on blueprints, work orders, contacts or engineering specifications unless there has been written authorization.

\* \* \*

*Id.* at Cincinnati199-202.

- 22 -

### iii. <u>The 2021-22 Umbrella Coverage</u>

70. The 2021-22 Policy also contains a commercial umbrella liability coverage part (the "2021-22 Umbrella Coverage") which provides, in pertinent part, that:

**SECTION I – COVERAGE**

**A.    Insuring Agreement**

1.    We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages for "bodily injury", "personal and advertising injury" or "property damage" to which this insurance applies:

   a.    Which is in excess of the "underlying insurance"; or

   b.    Which is either excluded or not insured by "underlying insurance".

2.    This insurance applies to "bodily injury", "personal and advertising injury" or "property damage" only if:

   a.    The "bodily injury", "personal and advertising injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

   b.    The "bodily injury" or "property damage" occurs during the policy period shown in the Declarations; and

   \* \* \*

*Id.* at Cincinnati252.

71. The 2021-22 Umbrella Coverage provides that:

25.    "Underlying insurance" means the insurance listed in the Schedule of Underlying Insurance and the insurance available to the insured under all other insurance policies applicable to the "occurrence". "Underlying insurance" also includes any type of self-insurance or alternative method by which the insured arranges for funding of legal liabilities that affords coverage that this Coverage Part covers.

*Id.* at Cincinnati268.

72. The Schedule of Underlying Insurance includes the 2021-22 CGL Coverage (as well as several other coverage parts to the 2021-22 Policy – whose terms are <u>not</u> implicated by Underlying Action). *See id.* at Cincinnati248.

73.     The 2021-22 Umbrella Coverage is also subject to several exclusions which may operate to limit or preclude the coverage provided thereunder, including the following providing that such coverage will not be afforded for:

**3.      Contractual Liability**

Any liability for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for "bodily injury", "personal and advertising injury" or "property damage":

a.      That the insured would have in the absence of the contract or agreement; or

b.      Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

* * *

**4.      Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

a.      A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

b.      A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

* * *

**6.      Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**7.      Damage to Your Work**

"Property damage" to "your work" arising out of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

* * *

- 24 -

**18.    Recall of Products, Work or Impaired Property**

Any liability or damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**a.**    "Your product";

**b.**    "Your work";

**c.**    "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

*Id.* at Cincinnati253-58.

74.    The 2021-22 Umbrella Coverage also is subject to an endorsement entitled Fungi or Bacteria Exclusion which modifies the coverage provided by, and adds an exclusion to, the 2021-22 Umbrella Coverage. *See id.* at Cincinnati174.

75.    The Fungi or Bacteria Exclusion to the Umbrella Coverage differs slightly in its terms than the Fungi or Bacteria Exclusion applicable to the CGL Coverage, and provides that the 2021-22 Umbrella Coverage will not apply to:

* * *

**Fungi or Bacteria**

**a.**    *Any liability* caused directly or indirectly, in whole or in part, by any actual, alleged or threatened:

(**1**) Inhalation of;

(**2**) Ingestion of;

(**3**) Contact with;

(**4**) Absorption of;

(**5**) Exposure to;

(**6**) Existence of; or

(**7**) Presence of,

any "fungi" or bacteria on or within a building or structure, including its contents, whether occurring suddenly or gradually;

**b.** Any loss, cost, or expense associated in any way with, or arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, mitigating or disposing of, or in any way responding to, investigating, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity;

**c.** Any liability, with respect to "fungi" or bacteria, arising out of, resulting from, caused by, contributed to, or in any way related to any supervision, instruction, recommendation, warning or advice given or which should have been given in connection with:

**(1)** The existence of "fungi" or bacteria;

**(2)** The prevention of "fungi" or bacteria;

**(3)** The remediation of "fungi" or bacteria;

**(4)** Any operation described in Paragraph A.2.b. above;

**(5)** "Your product"; or

**(6)** "Your work"; or

**d.** Any obligation to share damages with or repair any person, organization or entity, related in any way to the liability excluded in Paragraphs A.2.a., b., or c. above;

regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to the injury or damage.

However, this exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for human ingestion.

\* \* \*

**C.** For the purposes of this endorsement, **SECTION V – DEFINITIONS** is amended to include the following:

"Fungi" means any type or form of fungus, an includes, but is not limited to, any form or type of mold, mushroom or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

*Id*. at Cincinnati 174-75 (emphasis added).

**B.** **The 2022-23 & 2023-24 Policies**

76. The 2022-23 & 2023-24 Policies provide certain commercial general liability coverage pursuant to form CG 00 01 04 13 (the "2022-23 & 2023-24 CGL Coverages") and commercial umbrella liability coverage pursuant to form US 101 09 20 (the "2022-23 & 2023-24

Umbrella Coverages"). *See* Ex. 2 at Cincinnati026 and Cincinnati108; *See* Ex. 3 at Cincinnati029 and Cincinnati108.

77.     The 2022-23 & 2023-24 CGL Coverages provide, in pertinent part, that:

**1.      Insuring Agreement**

a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any occurrence and settle any claim or "suit" that may result. But:

(1)     The amount we will pay for damages is limited as described in **SECTION III – LIMITS OF INSURANCE**; and

(2)     Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgment or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

b.      This insurance applies to "bodily injury" and "property damage" only if:

(1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2)     The "bodily injury" or "property damage" occurs during the policy period; and

* * *

Ex. 2 at Cincinnati026; Ex. 3 at Cincinnati029.

78.     Further, the 2022-23 & 2023-24 Umbrella Coverages provide, in pertinent part, that:

**SECTION I – COVERAGE**

- 27 -

**A.**     **Insuring Agreement**

    **1.**     We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages for "bodily injury", "personal and advertising injury" or "property damage" to which this insurance applies:

        **a.**     Which is in excess of the "underlying insurance"; or

        **b.**     Which is either excluded or not insured by "underlying insurance".

* * *

    **3.**     This insurance applies to "bodily injury", "personal and advertising injury" or "property damage" only if:

        **a.**     The "bodily injury", "personal and advertising injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

        **b.**     The "bodily injury" or "property damage" occurs during the policy period shown in the Declarations; and

* * *

Ex. 2 at Cincinnati110; Ex. 3 at Cincinnati110.

79.     The 2022-23 & 2023-24 Policies contain identical definitions for those terms included in quoted text as those definitions included in the 2021-22 Policy and referenced above in this complaint. *See* Ex. 2 at Cincinnati38-42, Cincinnati123-28; Ex. 3 at Cincinnati41-45, Cincinnati123-28.

80.     Moreover, the relevant exclusions applicable to the 2021-22 CGL Coverage and the 2021-22 Umbrella Coverage, as outlined above in this complaint, are also included within – and are applicable to – the 2022-23 & 2023-24 CGL Coverages and the 2022-23 & 2023-24 Umbrella Coverages, respectively. *See* Ex. 2 at Cincinnati027-35, Cincinnati074-75, Cincinnati111-16; *see* Ex. 3 at Cincinnati030-34, Cincinnati081-82, Cincinnati111-117.

81. The 2022-23 & 2023-24 Policies do not, however, contain any Product Recall Expense Coverage Endorsement nor contain any Errors & Omissions Coverage parts similar to those included in the 2021-22 Policy. *See generally* Ex. 2; *see also* Ex. 3.

82. Accordingly, any potentially available coverage provided by the Product Recall Expense Coverage Endorsement or the Errors & Omissions Coverage.

## VI. THE UNDERLYING ACTION

### A. Facts

83. On or about January 11, 2024, Happy Hour, the underlying plaintiff, initiated the Underlying Action by filing its complaint, naming Can Man, LLC d/b/a Best Bev Co., Best Bev, LLC and John DOES 1 through 100 as defendants thereto, in the United States District Court for the Northern District of New York pursuant to docket number 3:24-cv-00047 (the "Underlying Complaint").

84. A true and correct copy of the Underlying Complaint is attached hereto as "Exhibit 4."

85. The Underlying Complaint states that "Happy Hour is an alcoholic beverage manufacturer . . . [that] sells 'Ready to Drink' tequila seltzer cocktails, which are mixed and placed into cans at Can Man's manufacturing facility." Ex. 4 at ¶ 9.

86. Happy Hour alleges in the Underlying Complaint that the claims and damages asserted therein arise out of Can Man's reckless and negligent manufacturing procedures which caused Happy Hour to incur millions of dollars in damages because of the defective product delivered to Happy Hour by Can Man. *See id.* at ¶ 1.

87. The specific allegations upon which the Underlying Action is premised include:

\* \* \*

11. From its inception, Happy Hour has engaged with co-packer Can Man to pack its cocktails into cans. As co-packer, Can Man is responsible for receiving Happy Hour's ingredients from vendors, storing them, and batching them into the ready-made cocktails that are sold to consumers. Accordingly, Can Man has significant influence over the process that eventually created a Happy Hour cocktail.

12. . . . Can Man has packed over 1 million cans of Happy Hour cocktails annually, split into orders ("runs") that can total over 240,000 cans per order.

13. In November 2022, while Can Man was still packing cans in Pennsylvania, Happy Hour requested a run of approximately 10,000 cases, or 240,000 cans. However, upon receipt of the cans, Happy Hour discovered that nearly 80 percent of the cases contained cans that were leaking and could not be repaired. At this time, the cans were sitting at Happy Hour's distributors warehouse in California. Republic National Distributing Company ultimately disposed of nearly 8,000 cases of its product due to the faulty packaging process, and billed Happy Hour back for the damages.

14. Happy Hour investigated the reason for the faulty packaging process, contacting Ardagh Metal Packaging ("Ardagh"), which supplies the metal beverage cans for Happy Hour's product. Ardagh noted that the leaking product was due to higher copper levels in the tequila and higher dissolved oxygen level.

15. Happy Hour subsequently contacted Can Man to discuss the apparent increase in copper levels in the tequila, and Can Man expressly disclaimed any liability for increased copper levels. Can Man provided Happy Hour with a report stating that copper levels had decreased in the new tequila mixture, from 1.94 mg/L to 1.61. Can Man further claimed that no other suppliers had encountered issues with leaking products, and asked Happy Hour to call each of its other ingredient vendors to ask if any of their ingredients had been changed or had noticed any changes in copper levels. However, no other vendors had ever used copper in their ingredients.

16. Can Man encouraged Happy Hour to continue working with Can Man due to their longstanding business relationship, promising that it would investigate the source of the leakage while Can Man and Happy Hour maintained their business relationship. Happy Hour never received a report, nor any financial remedy, stemming from the promised investigations by Can Man into the November 2022 run.

17. Happy Hour continued its relationship with Can Man based on Can Man's consistent denial of fault and the parties' longstanding business relationship. Unaware of any underlying issues with Can Man's packaging process, Happy Hour ordered an additional run of 5,000 cases in April of 2023 and

- 30 -

7,000 cases in July 2023. However, the both the April and July runs carried issues of its own.

18. In connection with the April run, cans again began to leak and had to be disposed.

19. In connection with the July run, Happy Hour again received defective product. This time, the Happy Hour cans developed the same tiny holes that later leaked, as with the November 2022 run, while other cans were so misshapen that consumers would not be able to put the cans down on surfaces while drinking.

20. Prior to the November 2022 run, Can Man unilaterally decided to change the tequila in Happy Hour's recipe. Upon information and belief, the new tequila contained significantly higher levels of copper that led to corrosion in the cans.

21. The change in copper levels and the significantly higher oxygen levels caused the cans to corrode, and as a result, the cans developed tiny holes, from which there was significant amounts of product leakage. However, Can Man neglected to test cans while making the switch in its ingredients or check the dissolved oxygen specs when running the cans.

22. Can Man intentionally and continually concealed each of these facts from Happy Hour. In fact, Can Man expressly denied all fault in the November 2022 production run despite knowing that it was their changes that directly caused the products to become defective. Can Man even provided Happy Hour with a test report stating that the new tequila contained lower levels of copper than the prior mixture, attempting to expressly refute any concerns over its packaging process, when the opposite was true.

23. Happy Hour was finally able to glean this important fact in October 2023, as Can Man admitted liability for its failure to test the new ingredient mixture. However, Happy Hour had continued to engage Can Man for additional runs in the meantime without receiving any remedy for the defective November 2022 run. Had Happy Hour been aware, following the November 2022 run, that Can Man's decisions directly produced the defective cans before agreeing to continue its relationship with Can Man, Happy Hour would have further pursued claims for compensation and reconsidered its relationship with Can Man.

24. Additionally, in October 2023, Can Man, following an internal investigation, accepted liability for its failure in the July 2023 packaging process, providing Happy Hour with a written complaint, filed by a Can Man worker, stating that Happy Hour's cans were not packed properly due to incorrect tooling on the production line.

25. As a result of Can Man's actions, Happy Hour has been left with a financially significant amount of unusable product from multiple defective runs. Happy Hour has lost a tremendous amount of capital stemming from these defective products, between bill back for damaged product by its distributor, buybacks of damaged products in the market, loss of retailer accounts due to product leaking onto floors and molding on shelves, loss of brand goodwill, and loss of customers. Moreover, Happy Hour is still learning of further damages stemming from the defective July 2023 run and losing additional capital as a result.

* * *

*Id.* at ¶¶ 11-25.

88.    Based on the foregoing allegations, Happy Hour asserts four causes of action against Can Man and Best Bev: Count I – negligence; Count II – unjust enrichment; Count III – fraudulent misrepresentation; and, Count IV – fraudulent concealment and/or fraud in the inducement. Ex. 4 at ¶¶ 26-58.

89.    Pursuant to Count I for negligence, Happy Hour asserts, in part, that:

27. Can Man was responsible for the manufacturing process for Happy Hour. Happy Hour would send its aluminum cans, ingredients, and packaging materials to Can Man. Can Man procured the tequila and citric acid that was used in the product, among some other ingredients items. Can Man was responsible for batching the ingredients, filling the cans on the production line, making sure the product was run per certain specifications, placing the cans into 4 packs and 8 packs, placing finished cases into pallets, and loading them on trucks to go to Happy Hour's distributors. Additionally, Can Man was responsible for ensuring that its production lines were clean and not littered with items that could cause holes to be poked in Happy Hour cans.

28. Can Man owed Happy Hour a duty to use reasonable care during the manufacturing process since it was in exclusive control of certain procurement, storage, production, and packaging. This duty includes the duty to review specifications for the aluminum cans regarding permissible dissolved oxygen levels, and also the duty to disclose changes in key components. Additionally, Can Man was under a duty to ensure that its production lines were not littered with items that could cause holes to be poked in Happy Hour Cans.

29. Can Man breached this duty when it failed to review the dissolved oxygen specifications for the aluminum cans and consequently ran the dissolved oxygen levels at much higher level. Additionally, Can Man breached its duty when unilaterally decided to change the tequila to be used in the

production run and failed to provide any specification regarding the composition of the new tequila used in the cans. Additionally, Can Man breached its duty when not running product on a clean production line, which caused holes to appear in cans, causing product to leak and damage entire pallets of inventory.

30. Can Man's actions caused damages to Happy Hour. As a result of Can Man's negligence, Happy Hour was injured and suffered considerable damages. Happy Hour's distributors have billed it back for the all the damaged inventory and has been fearful of placing large orders since it is uncertain whether such production issues will persist. Additionally, Happy Hour had to pause productions until it could figure out what the underlying issue cause of the leaking was. Happy Hour's retailers are unwilling to purchase the product for fear it will continue to leak and mold on their shelves. Happy Hour customers have also complained to Happy Hour via social media of wet boxes and empty cans when purchasing in stores. Additionally, Happy Hour sales representatives have been required to repurchase product from stores that are molded or damaged as a result of the defective productions. In sum, Can Mans negligence has caused Happy Hour millions of dollars in damages as it has effected Happy Hours['] relationship with its distributors, retailers, and costumers. For an early-stage start-up, such wide spread damages can be fatal.

*Id.* at ¶¶ 27-30.

90.    As to Count II, for unjust enrichment and/or quasi contract, Happy Hour alleges, in part, that:

33. Happy Hour performed services in good faith.  Happy Hour received and paid invoices payable to Can Man.  Happy Hour paid invoices for Can Man's services, even in defective runs.  Happy Hour initially paid Can Man for the November 2022 and July 2023 runs and continued to pay Can Man for additional urns between the two runs at issue.

34. Can Man accepted Happy Hour's orders and accepted Happy Hour's payments.

35. Can Man filed to provide usable product.  Can Man and Happy Hour had previously agreed to specifications for its product and all previous runs had conformed to these specifications, so it was understood by both parties that the November 2022 and July 2023 runs would meet these same specifications.  Can Man failed to produce a usable product, going well beyond any specifications agreed upon by the parties.

36. Happy Hour, under its contract with Can Man, was entitled to the merchantability of its product under the contract. Can Man did not expressly

disclaim and failed to reserve any exclusions to the implied warranty of merchantability under UCC 2-314.

37. As a direct and proximate result of Can Man's breach, Happy Hour has suffered damages in an amount to be determined at trial. This damage includes, but is not limited to, the reasonable value of expenses stemming from consumer product returns, loss of retail accounts, loss of brand goodwill, and failure to fulfill its obligations to other distributors.

*Id.* at ¶¶ 33-37.

91. In Count III for fraudulent misrepresentation, Happy Hour alleges, in part, that:

39. In February and March of 2023, Andrew Zimmerman and Anthony Ciocci of Can Man expressly disavowed any liability related to increased copper levels in Happy Hour's product due to changes in the tequila.

40. Defendant Can Man and DOES 1-100 falsely represented that Can Man was not responsible for the faulty production of cans in the November 2022 run. In fact, Can Man instructed Happy Hour to contact each of tis ingredient vendors and ask them whether their products had changed their copper composition, when no other ingredient vendor utilized copper to create its product, knowing that Can Man was at fault from the start.

41. Defendants' representations were, in fact, false. Instead, the true facts include, inter alia, that Can Man had indeed changed its own product mix to incorporate more copper into its production process, that the change in copper levels along with increased (and out of spec) dissolved oxygen levels, increased the corrosiveness of the product, and led to a significant increase in the production of defective cans as a result.

42. When Defendants made these representations, they knew them to be false and made these representations with the intention to deceive and defraud Happy Hour and to induce Happy Hour to act in reliance on the representations in the manner herein alleged, or with the expectation that Happy Hour would so act. Defendant also made these representations to avoid liability (which it knew to be substantial) and to continue a working relationship with Happy Hour despite its indisputable negligence.

* * *

45. Based on and in justifiable reliance on Defendants' representations, Happy Hour continued its relationship with Can Man with the expectation that Can Man would investigate the source of the leakage, forgoing compensation for Can Man's mistakes. Had Happy Hour known the true facts, it would have sought financial compensation from Can Man's insurance based on Can Man's failure to produce the proper product, and discontinued its relationship with Can Man.

- 34 -

* * *

47. This damage includes, but is not limited to, expenses stemming from consumer product returns, loss of retail accounts, loss of brand goodwill, and failure to fulfill its obligations to other distributors.

*See id.* at ¶¶ 39-47.

92. Pursuant to Count IV for fraudulent concealment and/or fraud in the inducement, Happy Hours alleges, in part, that:

49. On Friday October 20, 2023 at approximately 7 A.M. Pacific Standard Time, principals at Happy Hour discovered for the first time that the leaking in connection with the November 2023 run was caused by increased copper levels in its product. During a zoom call to discuss issues with the July 2023 production, Jesse King of Can Man asked John Pitts of Can Man whether Happy Hour was one of the clients that suffered damages due to increased copper levels. This was the first time the principals from Happy Hour heard members of Can Man acknowledge anything related to the increased copper levels causing damage to the product.

50. In the wake of the November 2022 run, Can Man expressly denied all liability for its faulty product and promised Happy Hour it would investigate its processes.

51. Happy Hour continued to engage Can Man for further business and ultimately chose not to seek financial compensation for the faulty product based on Can Man's reassurances and promises to investigate.

52. Upon information and belief, Can Man was aware that it had changed the tequila in Happy Hour's recipe and failed to test the effects of the change on Happy Hour's cans. Can Man was aware that this change caused the cans to develop holes and leak Happy Hour product despite expressly claiming otherwise.

53. Can Man failed to inform Happy Hour their changes were the primary reason for defective product production, and upon information and belief, continued to represent that it was not responsible for the product leakage in the November 2022 run.

54. Can Man has conducted several runs of Happy Hour product — and other alcoholic beverages — in the past and, upon information and belief, was aware or should have been aware, that the change in tequila needed to be tested and that untested changes could result in damage to the product. The change in ingredients without subsequent testing was a material alteration to the terms of the contract between the parties, and Can Man knew or should

have known that its denial of the product issue would induce Happy Hour to avoid seeking financial compensation for the failed November 2022 run.

\* \* \*

56. As a result of Can Man's omissions, Happy Hour was prevented from seeking financial redress for the failed November 2022 run and continued to pay for the damages suffered under the November run out of its own pockets, nearly bankrupting Happy Hour in the process. Additionally, Happy Hour was induced to continue engaging with Can Man, leading to the failed July 2023 run that further deepened Happy Hour's financial struggles.

\* \* \*

58. This damage includes, but is not limited to, expenses stemming from consumer product returns, loss of retail accounts, loss of brand goodwill, and failure to fulfill its obligations to other distributors.

*See id.* at ¶¶ 49-58.

### B.    <u>Damages Sought in the Underlying Action</u>

93.    Happy Hour's prayer for relief as to each of the causes of action asserted in the Underlying Action is nearly identical.  *See* Ex. 4 at 14-15.

94.    Pursuant to each cause of action pled in the Underlying Complaint, Happy Hour seeks damages for (i) consumer product returns, (ii) loss of retail accounts, (iii) loss of brand goodwill, (iv) failure to fulfill its obligations to other distributors, and (v) other appropriate consequential damages such as lost profits in an amount to be determined at trial.  *Id.*

95.    However, all of the allegedly damaged items for which Happy Hour seeks relief – the lost ingredients, the leaking mixed product, the damaged cans, and the damaged packaging – were all handled by Can Man as part of its mixing and packaging operation for Happy Hour.

96.    As such, the only "property damage" alleged is to "your product" (as defined in the below-described Policies) – and thus is excluded from coverage by the Your Product exclusion (or the Your Work exclusion to the extent that Defendants may contend that work, as opposed to a product, was involved).

97.     While the Underlying Complaint also contends that the product leaking onto shelves and floors of retailers resulted in mold, Happy Hour upon information and belief is not seeking recovery of damages on account of damage to shelves.  Further, any such damages are excluded by one or more of the Policy exclusions, including the Fungi exclusion.

98.     In addition, pursuant to Count III and Count IV, Happy Hour has asserted a claim for recovery of punitive damages – which also are not insured by the Policies nor insurable under applicable public policy.

## VII.    DEFENDANTS' CLAIM FOR COVERAGE

99.     By letter dated January 25, 2024, sent on behalf of Can Man, LLC and addressed to both HMK Insurance Company and Cincinnati, Can Man requested a defense as to the allegations of the Underlying Action (the "Tender Letter").

100.    In response to the Tender Letter, Cincinnati issued several reservation of rights letters to Can Man and Best Bev.

101.    A reservation of rights letter was issued to Can Man and Best Bev by Cincinnati in or about June 2024 (the "First RoR").

102.    Pursuant to the First RoR, Cincinnati offered to provide a defense to Can Man and Best Bev subject to a full and complete reservation of all of Cincinnati's rights and defenses, including but not limited to the right to deny (or limit) both defense and indemnity.

103.    A subsequent reservation of rights letter was issued to Can Man and Best Bev by Cincinnati on or about November 20, 2024 (the "Second RoR").

104.    A true and correct copy of the Second RoR is attached hereto as "Exhibit 5."

105.    The Second RoR was issued by Cincinnati in anticipation of a mediation in the Underlying Action which was scheduled for November 25, 2024. *Id.* at 1-2.

106.    Among other things, Cincinnati advised Defendants in the Second RoR that:

> Based on Cincinnati's review of this matter, including defense counsel's reporting, Happy Hour's September 20, 204 Response to Amended Interrogatories Demand, and documents produced in discovery in the Underlying Action, Cincinnati questions whether any off the damages sought by Happy Hour are covered by the Cincinnati Policies.  In fact, based on Cincinnati's evaluation and its understanding of what damages Happy Hour seeks, Cincinnati presently is of the belief that none of the damages alleged by Happy Hour are covered under any of the Cincinnati Policies.

* * *

> . . . Cincinnati reserves all of its rights to limit or deny coverage as set forth herein and in its prior letter.  Cincinnati's reservation includes the right to deny both defense and indemnity, as well as the right to seek a declaratory judgment as to the extent, if any, of Cincinnati's rights and duties in connection with this claim.

* * *

> Should the case not be settled at the mediation, Cincinnati reserves the right to . . . file a Declaratory Judgment Action seeking a ruling that Cincinnati has not duty to defend or indemnify Defendants.

*Id.* at 2, 6, 7.

## <u>COUNT I</u>
### *Against Can Man, LLC and Best Bev, LLC*
**For Declaratory Judgment That Cincinnati Has No Duty to Defend Pursuant to the Cincinnati Policies**

107.    Cincinnati hereby restates and incorporates by reference the averments of the preceding Paragraphs, as though same were set forth at length herein.

108.    For the reasons set forth herein, an actual, justiciable controversy exists between the parties concerning their respective rights and obligations, if any, under the Cincinnati Policies with respect to the Underlying Action.

109.    Specifically, there is a dispute between Cincinnati and Defendants regarding Cincinnati's obligation, if any, to provide a defense to Defendants in the Underlying Action.

110.    Upon information and belief, Defendants believe that they are entitled to a defense from Cincinnati for the claims asserted against them in the Underlying Action.

111.   Cincinnati disputes that the Cincinnati Policies obligate it to defend Can Man and/or Best Bev in the Underlying Action.

112.   Cincinnati seeks a declaration that it has no duty to defend Can Man and Best Bev in the Underlying Action.

113.   Cincinnati seeks a declaration that it may therefore withdraw the defense of Can Man and Best Bev that Cincinnati is currently providing – under a reservation of rights – in the Underlying Action.

114.   Pursuant to 28 U.S.C. § 2201, Cincinnati is entitled to a judicial determination concerning the scope and nature of its rights and other legal relations and obligations, if any, under the Cincinnati Policies with respect to the Underlying Action.

115.   First, Cincinnati seeks a judicial determination that, to the extent that any claims and damages asserted in the Underlying Action are not damages because of "property damage," – *i.e.*, physical injury to, or loss of use of, tangible property – coverage is not owed pursuant to the 2021-22 CGL Coverage, the 2021-22 Umbrella Coverage nor the 2022-23 & 2023-24 Policies. *See* Ex. 1 at Cincinnati058, Cincinnati077, Cincinnati252; *see* Ex. 2 at Cincinnati026, Cincinnati110; *see* Ex. 3 at Cincinnati029, Cincinnati110.

116.   In the Underlying Action, Happy Hour has asserted claims for Unjust Enrichment or Quasi-Contract (Count II), Fraudulent Misrepresentations (Count III), and Fraudulent Concealment/Fraud in the Inducement (Count IV).  Ex. 4 at 9-10, 12.

117.   These claims are not claims for "property damage" for which coverage would be owed under the Cincinnati Policies.

118.    The Cincinnati Policies provide coverage for "property damage" which includes only physical damage to, or loss of use of, tangible property.  *See* Ex. 1 at Cincinnati058, Cininnati077.

119.    Count II, Count III and Count IV in the Underlying Complaint do not assert claims for "property damage" but instead are claims for intangible losses relating to contractual liability. *See generally* Ex. 4.

120.    Second, Cincinnati seeks a judicial determination that claims and damages asserted in the Underlying Action for which Can Man and Best Bev seek coverage under the Cincinnati Policies were not caused by an "occurrence," *i.e.*, an accident, as defined and required by the 2021-22 CGL Coverage, the 2021-22 Umbrella Coverage and the 2022-23 & 2023-24 Policies to trigger coverage. *See* Ex. 1 at Cincinnati058, Cincinnati076, Cincinnati252; *see* Ex. 2 at Cincinnati026, Cincinnati110; *see* Ex. 3 at Cincinnati029, Cincinnati110.

121.    In Pennsylvania, in the context of commercial general liability policies:

> The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. That may even extend to an obligation to completely replace or rebuild the deficient work or product. That liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Indalex Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 83 A.3d 418 at 423-25 (Pa. Super. 2013).

122.    Further, in Pennsylvania, for claims and/or damages arising out of product-liability related claims to be considered to be arising out of an "occurrence," the damages to property that are claimed must be to property that is <u>not</u> the insured's own product or work.  *See id.* at 425.

123.     Moreover, consequential damage to property that is not the insured's own product, but which results from the faulty workmanship of the insured's product and which is reasonably foreseeable to result because of that faulty workmanship, will also not be considered to arise out of an "occurrence." *Northbridge Vill., LP v. Travelers Indemn. Co.*, No 15-1947, 2017 U.S. Dist. LEXIS 140541 (E.D. Pa. Aug. 31, 2017) ("[E]ven if these vague references to consequential damage can be construed to allege damage to property other than Plaintiff's work, the *Kvaerner* Court's holding has been extended to other property where the damage is a foreseeable result of the insured's faulty workmanship.")

124.     As mentioned previously, Happy Hour alleges that it "engaged with co-packer Can Man to pack its cocktails into cans.  As co-packer, Can Man [was] responsible for receiving Happy Hour's ingredients from vendors, storing them, and batching them into the ready-made cocktails that are sold to consumers . . . " and that "Can Man was responsible for batching the ingredients, filling the cans on the production line, making sure the product was run per certain specifications, placing the cans into 4 packs and 8 packs, placing finished cases into pallets, and loading them on trucks to go to Happy Hour's distributors." Ex. 4 at ¶¶ 11, 27.

125.     Thus, the mixture of the ingredients in the cans, the packaging of the cans, the distribution of the cans, and the cans themselves are all the product of Can Man and Best Bev.

126.     The Underlying Complaint seeks recovery for the following damages: expenses stemming from consumer product returns, loss of retail accounts, loss of brand goodwill, failure to fulfill its obligations to other distributors, lost profits, and other consequential damages. *See id.* at 14.

127.    All of these damages are alleged to have resulted from the faulty production of the cans which lead to the cans forming tiny holes from which the liquid mixture leaked on several occasions.  *See id.* at ¶¶ 13, 18-19, 21.

128.    Further, the Underlying Complaint alleges that Defendants unilaterally changed the tequila used in the liquid mixture which resulted in corrosion of the cans and subsequent leaks even when Defendants knew that the changes directly caused the cans to leak.  *Id.* at 20.

129.    The Underlying Complaint alleges that Defendants knew that the change had caused the leaks but that Defendants concealed this fact from Happy Hour "continually."  *Id.*

130.    Cincinnati does not owe coverage to Defendants to the extent that any damages alleged in the Underlying Action resulted from Defendants faulty workmanship and were reasonably foreseeable by Defendants.

131.    There is no coverage under the 2021-22 CGL Coverage, the 2021-22 Umbrella Coverage and the 2022-23 & 2023-24 Policies for any damages not caused by an "occurrence".  *See* Ex. 1 at Cincinnati058, Cincinnati252; *see also* Cincinnati026, Cincinnati110; *see also* Cincinnati029, Cincinnati110.

132.    Happy Hour alleges claims in Count III and Count IV for fraudulent misrepresentation and fraudulent concealment/fraud in the inducement; neither of which allege any "property damage" caused by an "occurrence".  Those claims are not based on accidental conduct but are instead explicitly premised on the alleged intentional conduct of Can Man and Best Bev.  *See* Ex. 4 at ¶¶ 38-58.

133.    Specifically, Happy Hour alleges in Count III that Defendants "knew [the representations] to be false and made these representations with the intention to deceive and

defraud Happy Hour and to induce Happy Hour . . . Defendant also made these representations to avoid liability (which it knew to be substantial) . . . ." Ex. 4 at ¶ 22.

134.    Happy Hour explicitly alleges in Count IV that Can Man and Best Bev's actions in failing to inform Happy Hour of the changes in the tequila recipe constituted intentional and willful fraudulent conduct. *Id.* at ¶ 57.

135.    The Underlying Complaint does not allege any fortuitous, or "accidental", loss to the extent that Can Man continued to mix, can and package product after having knowledge of the leaking.

136.    Additionally, one or more of the exclusions to the CGL Coverages applies to preclude coverage to Defendants for the Underlying Action.

137.    First, the Damage to Your Product and Damage to Your Work exclusions bar coverage for the damages sought in the Underlying Action. Ex. 1 at Cincinnati062-63, Cincinnati253; Ex. 2 at Cincinnati030, Cincinnati112; Ex. 3 at Cincinnati033, Cincinnati112.

138.    Happy Hour avers that it had to buy-back ". . . damaged products *in the market . . .*" which were failing due to the defective manufacturing process of the cans as products, including alleged defective production, mixing, and packaging of the cans and their ingredients – all of which was the responsibility of Can Man and Best Bev. Ex. 4 at ¶¶ 13, 20-21, 25, 27 (emphasis added).

139.    Second, the Expected or Intended Injury exclusion bars coverage to the extent that Can Man and/or Best Bev expected or intended the damages at issue, especially as to the later batches of product produced after Defendants knew of the leaking and/or the reason why the cans were failing. *See* Ex. 1 at Cincinnati059, Cincinnati254; *see* Ex. 2 at Cincinnati027, Cincinnati113; *see* Ex. 3 at Cincinnati030, Cincinnati113.

140.    The Underlying Complaint alleges that Can Man and Best Bev unilaterally changed the tequila ingredient used in the production of the cans at issue and that this change directly resulted in the cans developing tiny holes which caused the leaks complained of. Ex. 4 at ¶¶ 20-21.

141.    Further, the Underlying Complaint alleges that "Can Man intentionally and continually concealed each of these facts from Happy Hour . . . " and more specifically that:

> Can Man expressly denied all fault in the November 2022 production run despite knowing that it was their changes that directly caused the products to become defective.  Can Man even provided Happy Hour with a test report stating that the new tequila contained lower levels of copper than the prior mixture, attempting to expressly refute any concerns over its packaging process, when the opposite was true."

*Id.* at ¶ 22.

142.    Count III and Count IV of the Underlying Complaint are explicitly premised on the intentional conduct of Can Man and Best Bev in concealing the defective production of the cans *See id.* at ¶¶ 42, 52.

143.    Third, the Recall Exclusion included within the CGL Coverages and the 2021-22 Umbrella Coverage applies to bar coverage under those coverage parts.  *See* Ex. 1 at Cincinnati063, Cincinnati257-58; *see* Ex. 2 at Cincinnati030, Cincinnati116; *see* Ex. 3 at Cincinnati033, Cincinnati116.

144.    The Recall Exclusion precludes coverage for liability, damages or any other expense incurred by others for the recall, replacement, disposal, or loss of use of Can Man's and Best Bev's products and/or work that is caused by a suspected or known defect or deficiency. *See* Ex. 1 at Cincinnati063, Cincinnati257-58; *see* Ex. 2 at Cincinnati030, Cincinnati116; *see* Ex. 3 at Cincinnati033, Cincinnati116.

145. All the damages alleged by the Underlying Complaint relate to expenses and liabilities incurred by Happy Hour as a result of replacing and/or disposing of defectively produced cans which had been distributed to the third-party distributors of Happy Hour. *See generally* Ex. 4.

146. Fourth, the Damage to Impaired Property exclusion bars coverage to Can Man and Best Bev to the extent that the damages claimed (if any) arose out of the loss of use of other property – not including the products of Can Man and Best Bev – that has not itself been physically injured but results because of a defect or inadequacy in the cans manufactured by Can Man and Best Bev. Ex. 1 at Cincinnati063, Cincinnati253; Ex. 2 at Cincinnati030, Cincinnati111; Ex. 3 at Cincinnati033, Cincinnati111.

147. Fifth, the Fungi or Bacteria Exclusion bars coverage to Can Man and Best Bev. *See* Ex. 1 at Cincinnati174-75, Cincinnati319; Ex. 2 at Cincinnati074-75, Cincinnati138; Ex. 3 at Cincinnati081-082, Cincinnati138.

148. The Fungi or Bacteria Exclusion precludes coverage for any loss, cost or expense arising out of removing, mitigating, or otherwise remediating the effects of fungi or bacteria that is not on, or contained in, a product intended for human consumption. *See* Ex. 1 at Cincinnati174-75, Cincinnati319; Ex. 2 at Cincinnati074-75, Cincinnati138; Ex. 3 at Cincinnati081-082, Cincinnati138.

149. The Underlying Complaint alleges that product leaking onto the floors resulting in "molding on shelves" and that "retailers [are unwilling] to purchase the product for fear it will continue to leak and mold on their shelves". Ex. 4 at 25, 30.

150.    Sixth, coverage also is barred to the extent that the Contractual Liability exclusion applies.  *See* Ex. 1 at Cincinnati059, Cincinnati253; *see* Ex. 2 at Cincinnati027, Cincinnati111; *see* Ex. 3 at Cincinnati030, Cincinnati115.

151.    The Contractual Liability Exclusion precludes coverage to the extent that liability for "property damage" is assumed in a contract or agreement.  *See* Ex. 1 at Cincinnati059, Cincinnati253; *see* Ex. 2 at Cincinnati027, Cincinnati111; *see* Ex. 3 at Cincinnati030, Cincinnati115.

152.    Happy Hour's claims pursuant to Count II, Count III, and Count IV are each based the parties' contract; specifically, the claims relate to Defendants' failure to comply with the terms of the parties' contract and Defendants' intentional misrepresentations and concealment of facts pertinent to Defendants' faulty workmanship.  *See* Ex. 4 at 31-58.

153.    Turning to the Product Recall Expense Coverage Endorsement in the 2021-22 CGL Coverage, that coverage also does not apply.  *See* Ex. 1 at Cincinnati158-62.

154.    First, the coverage provided by the Product Recall Expense Coverage Endorsement applies to product recall expenses incurred by "you", *i.e.* Can Man and/or Best Bev, not for expenses as incurred by Happy Hour.  *See* Ex. 1 at Cincinnati158.

155.    Second, the Product Recall Expense Coverage is subject to a Faulty Formula or Specifications exclusion. Ex. 1 at Cincinnati159.

156.    That exclusion precludes coverage for product recall expenses arising out of faulty formulas or specifications. *See id.*

157.    The Underlying Complaint alleges that Can Man unilaterally decided to change the tequila used in the product mix which directly led to the alleged corrosion of the cans and consequentially to all of the damages alleged. Ex. 4 at ¶ 20.

158. Third, the Legal Defense exclusion to the Product Recall Expense Coverage precludes such coverage for any claim or suit against Defendants. Ex. 1 at Cincinnati160.

159. Fourth, the Deterioration, Decomposition or Chemical Transformation exclusion to the Product Recall Expense Coverage precludes coverage for any product recall initiated because a transformation of a chemical nature or any deterioration or decomposition of "your product." *Id.* at Cincinnati159.

160. As previously discussed, the Underlying Complaint alleges that the change in the tequila mixture caused higher levels of copper and oxygen levels which caused the cans to corrode and leak. Ex. 4 at ¶ 20-21.

161. Fifth, the Product Recall Expense Coverage is subject to the Third Party Damages, Fines and Penalties exclusion. *Id.* at Cincinnati160.

162. The Third Party Damages, Fines and Penalties exclusion precludes coverage under the Products Recall Expense Coverage for any compensatory damages awarded in a civil action as well as any punitive damages. *See id.*

163. Sixth, the Product Recall Expense Coverage is only included in the 2021-22 Policy; as such, no such Product Recall Expense Coverage is potentially applicable for the policy periods pertinent to the 2022-23 & 2023-24 Policies. *See generally* Ex. 2; *see also* Ex. 3.

164. Finally, turning to the E&O Coverage provided for in the 2021-22 Policy only, coverage to Can Man or Best Bev for the Underlying Action is not available. *See* Ex. 1 at Cincinnati199-208.

165. The insuring agreement of the E&O Coverage provides that its coverage is only available for claims made during the policy period of the 2021-22 Policy and its 30-day extended reporting period. *See id.* at Cincinnati199.

166.    The E&O Coverage provides that the timing of when a claim is made is governed by paragraphs 3.a and 3.b of the insuring agreement. *See id.*

167.    No insured reported to Cincinnati any claim related to Happy Hour or the Underlying Action until notice of the Underlying Complaint was provided to Cincinnati on or around January 25, 2024.

168.    Further, upon information and belief, no insured received written notice of a suit or a written demand for money damages during the 2021-22 Policy's policy period or the extended reporting period thereto.

169.    Accordingly, the E&O Coverage does not provide any available coverage to Can Man or Best Bev for the Underlying Action.

170.    The E&O Coverage is further subject to exclusions which further bar any such coverage, including the Fungi or Bacteria Exclusion, the Recall of Products and the Work or Impaired Property exclusions. Ex. 1 at Cincinnati200-02.

171.    The E&O Coverage is also subject to a Bodily Injury, Property Damage, or Personal and Advertising Injury exclusion which precludes coverage for damages to property if the damaged property is not an insured's own product or work. *Id.* at Cincinnati199-200.

172.    Further, the E&O Coverage is subject to a Contractual exclusion which precludes coverage for liability that an insured would not have in the absence of a contract or agreement. *Id.* at Cincinnati200.

173.    Additionally, the E&O Coverage is subject to a Noncompensatory Damages exclusion which precludes coverage for all non-monetary damages and/or punitive damages. *See* Ex. 1 at Cincinnati201.

174. The E&O Coverage also is subject to a Substitutions exclusion which precludes coverage for any liability arising from a decision to substitute a material or product for one specified in contracts or agreements. *See id.* at Cincinnati202.

175. Upon information and belief, Can Man and Best Bev unilaterally decided to change the tequila used in their manufacturing process. Ex. 4 at ¶ 20.

176. Accordingly, the Substitutions exclusion precludes the E&O Coverage for the Underlying Action.

**WHEREFORE**, Plaintiff The Cincinnati Insurance Company respectfully requests that the Court enter an Order:

(a)    Declaring that Cincinnati has no duty to defend Can Man and Best Bev in the Underlying Action;

(b)    Declaring that Cincinnati may withdraw from the defense of Can Man and Best Bev in the Underlying Action; and

(c)    Granting Cincinnati such other and further relief as may be necessary and appropriate under the circumstances.

<u>**COUNT II**</u>
*Against Can Man, LLC and Best Bev, LLC*
**For Declaratory Judgment That Cincinnati Has No Duty To Indemnify**

177. Cincinnati hereby restates and incorporates by reference the averments of the preceding Paragraphs, as though same were set forth at length herein.

178. For the reasons set forth above in Count I of this complaint, there are no damages asserted against Can Man and/or Best Bev in the Underlying Action that are potentially covered under the Cincinnati Policies.

179. Accordingly, Cincinnati is entitled to a declaration pursuant to 28 U.S.C. § 2201 that it has no duty to indemnify Can Man and/or Best Bev in connection with any judgment or settlement in the Underlying Action.

**WHEREFORE**, Plaintiff The Cincinnati Insurance Company respectfully requests that the Court enter an Order:

    (a)    Declaring that Cincinnati has no duty to indemnify Can Man and/or Best Bev for any judgment or settlement in the Underlying Action; and

    (b)    Granting Cincinnati such other and further relief as may be necessary and appropriate under the circumstances.

    (c)    **Or, in the _alternative_**, declare which damages, if any, being sought in the Underlying Action are not covered by the Cincinnati Policies and thus need not be indemnified by Cincinnati – including but not limited to:

        (i)    any damages awarded pursuant to Counts II (unjust enrichment), Count III (fraudulent misrepresentation) or Count IV (fraudulent concealment and/or fraud in the inducement) of the Underlying Action;

        (ii)    any damages to the cans, packaging and product of Defendants, or amounts incurred to destroy any ;

        (iii)    any amounts incurred by Happy Hour to buy back defective product from its distributors or any other person/entity or provide chargebacks to distributors;

        (iv)    damages relating to Happy Hour's alleged loss of customers/business;

        (v)    damages relating to any loss in the value of Happy Hour's business;

        (vi)    any damages caused directly or indirectly, in whole or in part, by any actual, alleged or threatened exposure to or existence of mold; and

        (vii)    punitive damages.

### COUNT III
_Against Can Man, LLC and Best Bev, LLC_
**For Declaratory Judgment That Cincinnati Has No Duty To Indemnify Any Costs, Interest, Or Damages Attributable To Punitive Or Exemplary Damages In The Underlying Action**

180.    Cincinnati hereby restates and incorporates by reference the averments of the preceding Paragraphs, as though same were set forth at length herein.

181.    In Pennsylvania, punitive damages alleged for the direct liability of the insured are uninsurable as a matter of law.  *Esmond v. Liscio*, 224 A.2d 793, 800 (Pa. Super. Ct. 1966).

182.    Happy Hour has asserted a request for punitive damages pursuant to Counts III and IV in the Underlying Action on a theory of direct liability.  Ex. 4 at 15.

183.    To the extent it is determined that Cincinnati has a duty to defend Can Man and Best Bev under the Cincinnati Policies, pursuant to the terms, provisions, definitions, exclusions, conditions, and limitations of the Cincinnati Policies, Cincinnati still would have no duty to indemnify Can Man and Best Bev for any costs, interest, or damages attributable to punitive or exemplary damages.

184.    Accordingly, Cincinnati is entitled to a declaration pursuant to 28 U.S.C. § 2201 that it has no duty to indemnify Can Man and Best Bev in connection with any costs, interest, or damages attributable to punitive or exemplary damages in the Underlying Action.

**WHEREFORE**, Plaintiff The Cincinnati Insurance Company respectfully requests that the Court enter an Order:

(a)    Declaring that Cincinnati has no duty to indemnify Can Man and Best Bev for any claim of indemnification for punitive or exemplary damages; and

(b)    Granting Cincinnati such other and further relief as may be necessary and appropriate under the circumstances.

- 52 -

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:  January 24, 2025                    **POST & SCHELL, P.C.**


By:     */s/   Anthony L. Miscioscia*
ANTHONY L. MISCIOSCIA, ESQ.
PA ID NO. 69215
Three Logan Square, 24th Floor
1717 Arch Street,
Philadelphia, PA  19103
Phone:  215-587-1170
Email: amiscioscia@postschell.com;
*Attorney for Plaintiff The Cincinnati
Insurance Company*